26644.   NEW YORK LIFE INSURANCE COMPANY *v.* BRADFORD.

DECIDED FEBRUARY 22, 1938.   REHEARING DENIED MARCH 29, 1938.

*C. L. Cowart, A. S. Bradley,* for plaintiff in error.
*B. D. Dubberly, G. B. Everitt,* contra.

GUERRY, J.   This is the second appearance of this case in this court.   See 55 *Ga. App.* 248 (189 S. E. 914).   The plaintiff seeks a recovery of disability benefits under three insurance policies issued to him by the defendant insurance company.   The petition alleged in substance that in October, 1933, plaintiff became disabled within the meaning of the provisions of the policies sued

upon as a result of a serious fracture of his right thigh, caused by a gunshot wound, and that his claim for disability benefits was recognized by the defendant and benefits were paid up to January 1, 1935, at which time the defendant refused to make further payments; that on or before that date plaintiff became disabled from other and additional ailments, to wit, neuritis or rheumatism; that defendant, at or before the time it ceased making payments, did not request of the plaintiff further and additional proof of his disability, but denied his claim, although on January 31, 1935, he wrote defendant a letter insisting that he was totally disabled and in which he offered to submit to medical examination and furnish any additional information desired. On the former appeal the court said: "It is apparent that in refusing to continue payments the defendant did not have in mind any disability of the plaintiff other than that originating from a gunshot wound, as the plaintiff had not, according to the exhibits, or from any allegation in the petition, reported any disability from rheumatism or neuritis as was subsequently alleged by amendment to have arisen 'on or before January 1, 1935,' and to have existed since. Nevertheless the defendant did know, as shown by the letters from the plaintiff, that the latter was claiming to be still disabled. If he was totally and permanently disabled from the original gunshot wound, or totally and permanently disabled because the disability had continued by reason of aggravation by rheumatism and neuritis, or totally and permanently disabled because of rheumatism and neuritis independently of the gunshot wound, he was so disabled as to be entitled, under the policies, to the monthly payments upon complying with the terms of the policy as to furnishing due proof, or if, upon being notified by the plaintiff that he was totally and permanently disabled within the meaning of the policies, the defendant refused to make payment, without predicating its refusal upon any failure of the plaintiff to make proof upon demand by the defendant." Since the law of the case has become fixed, the only questions now before this court are, (1) did the plaintiff offer sufficient evidence to authorize the jury to find that he was totally and permanently disabled for the period sued for within the meaning of the terms of the policies sued upon? (2) Was there sufficient evidence to authorize the jury to assess the defendant with attorney's fees? (3) Did the court err in admitting certain evidence over the objection of the defendant?

■ The plaintiff testified, in part, as follows: "Something happened to me about the 21st day of October, 1933. I got shot. As a result of that shot I went to the hospital. I was operated on as a result of that injury. Later, there was effort made by me to recover the disability benefits provided for in these policies of insurance. I submitted to them proof of my disability. As a result of the submission of that proof they paid me my disability benefits for twelve months. They paid me up until January 1, 1935. Since that time they have paid me no disability benefits. . . As to what my physical condition is, I could not say exactly only what the doctors say. They say it is neuritis or something. I know I am in aches and pains all the time. This occurred after the cast was taken off my leg. That was when I was operated on in Savannah. That condition is still existing. It has continued to exist since it first began. I did not have any of this trouble prior to my injury on October 1 [21?], 1933. I later went back to see some of the doctors who examined me. I went to see Dr. Branch and also Dr. Williams and Dr. G. W. Tootle. Dr. Williams later examined me again. I forget exactly what time it was, but it was when the New York Life Insurance Company had me examined. They had me examined by Dr. Williams. At that time my condition was bad. My ankle and knee was swollen bad and gave me a lot of pain and trouble. I had other pains in other places. They run all over my head and all about. Since that disability occurred on October 21, 1933, I have not been able to engage in my regular farm work. I had not been able to do any regular farm work since that time. After they refused to pay me my disability benefits and notified me they would cease the payments, I wrote them and explained to them the best way I could my condition. . . After I had communicated with them, in each and every instance they refused and declined to pay me the disability benefits. After they once stopped and declined they never did pay me any more benefits. I am forty-five years old. My occupation is farming. Well, my education is practically none, you might as well say. I was in the fourth grade when I quit school. When I say my occupation was farming, I mean I farm. It covers everything there is to do on the farm. I do all of it. At the time I went to Dr. Williams's office in Savannah he made a recommendation to me with reference to my condition. I

did what he requested. I did what he said about taking sun baths, and I wore an elastic support. They helped me some. . . Since October 21, 1933, I have not been able to engage in any farming. I am not now able to work at my occupation of farming. I have tried to work since this injury on October 21, 1933. Well, if I would go out and try to work for an hour or two, then I had to go and take my bed and call a doctor, and then I would suffer for weeks at a time, just go all to pieces somehow or other. I can't stand it. On each occasion I made an effort to work, that same occurred." It further appears from plaintiff's testimony that he owned a small farm of approximately sixty acres, and prior to his injury "did the superintending and labor on it too." He employed one man on the farm with him and with his help had been operating the farm; that at times it was necessary to employ additional laborers in gathering his crops; that since his disability he was still able to supervise the operation of the farm but was not able to do any of the farming work himself.

Dr. Williams, who treated the plaintiff and operated on him at the time he was shot, testified substantially as follows: "I attended the plaintiff, . . at one time for a broken or fractured leg. That was October 22, 1933. We reduced the dislocation and removed some particles of bullet and little shives of bone. His injury was a gunshot wound on the femur. It was what we call a compound, comminuted fracture. . . He consulted me in April of this year. He consulted me in April. I probably prescribed something for his pain. I decided it was mostly neuritis causing his discomfort. I did not think at the time that had anything to do with the wound. I later, on September 26, 1935, examined Mr. Bradford. I had an x-ray made. . . The x-ray was made by Dr. W. A. Cole. . . I made an examination of Mr. Bradford independently of the x-ray. From my experience with a fractured femur and the result of the treatment I don't see any reason why Mr. Bradford should not be able to perform some services. He could develop other conditions and cause him to be crippled, but, as far as the bone is concerned, it looks to me like it is in good position and healed thoroughly; and in other cases I have seen they have gone back to work in three or four months. I have never had an injury of this kind that did not go back to work in three or four months. In my opinion Mr. Bradford is

not suffering any total and permanent disability from this fracture. My examination was limited to that, just the fracture; of course, that leg, I could not tell whether he had got neuritis there or not. Of course he says he is in pain. We can't find that. I don't think there should be any pain as the after effects of this fracture, more than four months from just the fracture itself; that is if we got a good union in four months. Of course we have ununited fractures that have to be treated for a year, and have to have bone grafts, etc., but not when it heals properly. In the case of Mr. Bradford the fracture has healed up, in good condition. I am sure the operation and the healing was entirely successful. So far as the fracture is concerned, I am sure Mr. Bradford's limb is practically as sound as it ever was. I don't know what Mr. Bradford's disabilities are outside of the fracture. As to whether I stated he was suffering from neuritis, that is what I diagnosed it, because I felt pretty sure his fractured femur would not do him any harm. I think in some cases neuritis is a disabling ailment; sometimes we consider them partially disabled, but I don't think neuritis should produce complete total disability. Neuritis is a disabling disease. . . I don't know whether Mr. Bradford is able to engage in his usual and customary occupation of farming; I could not tell whether he is or not. I don't know whether Mr. Bradford is able to plow; so far as the fracture is concerned, he ought to be able to do anything; but, so far as the neuritis is concerned, I could not tell. That is something I could not tell. Neuritis is an indeterminable thing; you can't tell how much one suffers or how little. That is also true of rheumatism. You can't tell what is disabling when a man says he is suffering from rheumatism; you have to take his word for it. . . At the time of the last examination on September 26, 1935, his knee was swollen. I had forgotten about that, but his right knee was swollen. I don't think that was the result of the leg fracture. In my opinion it was some other cause that produced that. With reference to the treatment of the knee, I suggested hot applications and massages. I suggested that he get an elastic support. There were no other visible evidence of ailments he had at the time. There was the knee since you called my attention to it. That was the only objective symptom I saw. With that condition visible to me, from the condition I saw on that one occasion, I

don't think Mr. Bradford could plow; I think he could oversee.
.   .   Mr. Bradford would not have been able to plow when I saw
him on September 26th; I believe that was the date I saw him.
There was evidence of other ailment.  I remember that definitely
since you called it to my attention.  Mr. Bradford was disabled
at that time with his knee joint; I remember it.  .   .   I don't
think there is any reason why you should class that trouble he had
as a permanent and total disability.  As a rule, that is just some-
thing that comes and goes at times.  I don't think he could plow
when it is swollen and he is suffering from it.  In the course of
a few days, if that swelling disappeared, he would be able to re-
sume his usual duties.  It is the history of cases of that sort that
they do disappear.  There is such a thing as chronic rheumatism.
We have what we call chronic osteoarthritis, and such cases never
get well.  The x-ray is the only thing that will show that.  We
can't tell that by physical examination, but the x-ray will show
osteoarthritis.  As to whether Mr. Bradford was suffering with
chronic rheumatism, I don't know that.  I never saw him but
once."

Dr. Cole, who made an x-ray of plaintiff's knee and right femur,
testified substantially: "It [the femur] was well healed, with
good alignment, but apparently with slight shortening.  .   .   The
femur below the fracture is normal as is also the right knee joint.
My examination reveals that the bones are completely united, and
the alignment is good.  .   .   I did not notice whether or not there
was any swelling of the knee.  .   .   Neuritis is something that
can not be shown by x-ray examination.  .   .   From my examina-
tion, I see no reason why Mr. Bradford should be either totally or
permanently disabled.  .   .   If he had been engaged in farming
and his duties were confined to supervising the work of his hands
and laborers and doing some small amount of farm work, based on
my examination, there is no reason why he could not perform these
usual and customary duties as well as before his injury.  I con-
fined my examination altogether to the x-ray pictures made of the
leg or knee.  I have no knowledge of his other ailments whatever.
I know nothing from any other standpoint than that of the bony
condition revealed by the x-ray examination.  As to anything other
than that, I have no knowledge and could not say."  Dr. A. C.
Branch testified, that he had occasion to treat Mr. Bradford pro-

fessionally every two or three months for the past two or three years; that the plaintiff was suffering from alcoholic neuritis and "if he would leave off drinking long enough his neuritis would disappear. It would probably take two or three years."

We are of the opinion that the evidence for the plaintiff was sufficient to authorize the jury to find that he was totally disabled within the meaning of that term as fixed by the decisions in this State. See *New York Life Insurance Co.* v. *Thompson*, 50 *Ga. App.* 413 (178 S. E. 389), and cit. The evidence was sufficient to support a finding that the insured had a continuing total disability although its original cause, the leg fracture, might have been properly healed. We are not prepared to hold that the evidence of physicians of the objective symptoms, as described, as well as the subjective symptoms, as described by the plaintiff himself, and the effects caused thereby, were not sufficient to authorize a jury to make the finding they did. It was not successfully disputed that the plaintiff suffered as he claimed, irrespective of whether the leg fracture caused the suffering or whether it was caused by bad teeth, tonsils, alcoholism or otherwise. The plaintiff testified that he was not able to perform manual labor, and whether or not he was thereby prevented from performing all of the substantial duties of his ordinary occupation of farming, was, under the evidence, a question peculiarly for determination by the jury.

2. We are unable to say that the jury was unauthorized to find a verdict for reasonable attorney's fees. The company placed its refusal to pay, or stoppage of payments, upon the ground that its investigation showed that plaintiff's condition had so changed that he was no longer disabled under the terms of the policies. No medical examination was had or asked for prior to filing the suit, although plaintiff was insistent that he was still disabled. The jury refused to agree with the contention that plaintiff had recovered from his disability, whether the cause was rheumatism, neuritis, or the gunshot wound. The bad faith which authorizes a recovery of attorney's fees under Code, § 56-706, is not the equivalent of "having acted in bad faith," under Code, § 20-1404. Whether or not the defendant acted in bad faith in stopping disability payments and in refusing to continue them was for the jury.

■ Complaint is made that the court permitted the plaintiff to testify, over timely objection, that "Since October, 1933, I have not been able to engage in any farming: I am not now able to work at my occupation of farming." The objection was that the plaintiff was not an expert and that this testimony was a conclusion of the witness. The plaintiff having detailed his condition and the results of attempts to work, we think no witness more competent to testify as to what had been his past and what was his present condition. It might be that he would not be permitted to testify what would be his future condition or as to the permanency of his present condition, unless he first qualified himself as an expert; however, this was not the nature of his testimony and we think it clearly competent. In this same connection a witness, a neighbor of the plaintiff, was permitted to testify, over objection, that "He has not been able to work in the last three years." This witness had testified as to his means of seeing and knowing the plaintiff, and that before his original injury he had seen him "plow, dig stumps, get out posts, stretch wire, clean up new ground, and do most anything to be done on a farm. He did regular farm work." After making the statement objected to, he further testified: "I have not seen him do any work since he got shot. I saw him try one day and he give out in about an hour and one half." After having given the facts upon which he relied, the statement made was not objectionable. They were not with reference to a future condition, or as to the permanency of a condition, and if it be considered as opinion evidence it was based on facts detailed to the jury, and they could give it such weight as they saw fit.

The judge did not err in overruling the motion for new trial.

*Judgment affirmed. MacIntyre, J., concurs. Broyles, C. J., dissents.*

BROYLES, C. J., dissenting. In my opinion, the admission of the evidence complained of in special ground 5 of the motion for new trial was reversible error. Furthermore, under the evidence adduced, a verdict in favor of the defendant would have been amply authorized; and there was no evidence authorizing a finding that the defendant had acted in bad faith in defending the suit. It follows that the court erred in submitting to the jury the questions of bad faith and attorney's fees.